John H. **BUCHANAN**, Jr., et al.,
Plaintiffs,

v.

The **UNITED STATES POSTAL SERVICE**, an independent establishment of the Executive Branch of the United States Government, et al., Defendants.

No. CA74-H-407-S.

United States District Court,
N. D. Alabama, S. D.

May 14, 1974.

William G. Somerville, Jr., and John E. Grenier, Lange, Simpson, Robinson & Somerville, Birmingham, Ala., for plaintiffs.

Henry I. Frohsin, Asst. U.S. Atty., Birmingham, Ala., Jack T. DiLorenzo, Asst. Gen., Counsel, Opinions Div., Law Dept., U.S. Postal Service, Washington, D.C., for defendants.

## MEMORANDUM OF DECISION

HANCOCK, District Judge.

This action for injunctive relief was filed on April 30, 1974, and immediately thereafter counsel for plaintiffs presented to the court their request for the issuance of a temporary restraining order. Since the Department of Justice is required by 39 U.S.C. § 409(d) to furnish defendant United States Postal Service with legal representation, the United States District Attorney for the Northern District of Alabama, upon request of the court, attended the informal presentation. The court concluded that the request for a temporary restraining order, as well as the prayer for a preliminary injunction contained in the complaint, should be set down for hearing at the earliest possible date and scheduled such hearing for May 7, 1974. By order entered May 2, 1974, the hearing was continued until May 11, 1974. On May 7, 1974, plaintiffs filed their First Amendment to the Complaint which amendment in essence adds an additional factual basis upon which plaintiffs seek relief. All defendants were duly served with a copy of the original complaint and this court's order of April 30, 1974, on or before May 2, 1974.

This matter came on for hearing as scheduled in Birmingham, Alabama, on May 11, 1974. Present on behalf of plaintiffs were William G. Somerville, Jr., John E. Grenier and John Tally, all of Birmingham, Alabama. Present on

behalf of all defendants were Henry I. Frohsin, Assistant United States Attorney, Birmingham, Alabama, and Jack T. DiLorenzo, Assistant General Counsel, Opinions Division, Law Department, United States Postal Service, Washington, D. C. At the commencement of the hearing, plaintiffs filed a Second Amendment to the Complaint which has the effect of adding as plaintiffs John J. Duncan and Sam Steiger, individually and on behalf of the putative class John H. Buchanan, Jr. seeks to represent.[1]

Following the hearing and argument of counsel associated therewith, the court left the record open until noon on May 13, 1974, to permit the parties to file additional affidavits, depositions, documents and briefs which the parties felt should be considered by the court. The record has now been closed and the request for interlocutory injunctive relief has now been submitted to the court on the verified complaint; the verified First and Second Amendments to the Complaint; the affidavit of Carl C. Ulsaker attached to defendants' Motion to Dismiss; the affidavit of Edgar S. Brower; the affidavit of H.J. Welch; the affidavit of Henry Frohsin; the certified copies of certain news releases filed on May 11, 1974; the deposition of Edward V. Dorsey and all exhibits thereto; the deposition of Carl C. Ulsaker; the exhibit detailing the Retail Network Analysis; documents delivered to the court which, at the request of defendants, have been sealed to the extent that they are to be available only to all counsel and the court; a letter to Postmaster General Klassen, dated April 2, 1973, which was among certain documents defendants submitted to the court for an *in camera* examination with a claim for a 5 U.S.C. § 552(b) privilege which, as to this letter, the court is denying and directing that it be filed herein; and the evidence adduced in open court on May 11, 1974. After full con-

sideration thereof, the court proceeds to issue this memorandum of decision which, pursuant to Federal Rules of Civil Procedure, Rule 52, will contain the court's findings of fact and conclusions of law.

This action by plaintiffs Buchanan, Duncan and Steiger, individually and as a Federal Rules of Civil Procedure, Rule 23(b)(2) class action on behalf of postal users throughout the United States, challenges three proposed postal service programs of defendant United States Postal Service (hereinafter sometimes referred to as the "Postal Service"). The amended complaint alleges that the first of these programs (hereinafter referred to as the "Postal District consolidation and elimination program") will consolidate and eliminate all 86 Postal Districts throughout the United States. The amended complaint alleges that the second program (hereinafter referred to either as the "retail analysis program" or the "postal facilities' deployment program") involves major changes in the location, nature and number of post office facilities in 26 cities throughout the nation. The amended complaint alleges that the third program (hereinafter referred to as the "national bulk mail system program") involves the construction, at a cost of over one billion dollars, of 21 bulk mail centers and 12 auxiliary service facilities spaced throughout the nation.

Primarily the amended complaint seeks to enjoin the further implementation of these programs until (1) the Postal Service has submitted the programs to the Postal Rate Commission pursuant to 39 U.S.C. § 3661, (2) the hearing required by such Section 3661 has been completed, and (3) the Postal Rate Commission issues the opinion required by such Section 3661. The Postal Service does not claim that it submitted a proposal to the Postal Rate Commission embodying any of the alleged

---

1. Plaintiff John H. Buchanan, Jr. is a Member of Congress representing the Sixth Congressional District of Alabama; plaintiff John J. Duncan is a Member of Congress representing the Second Congressional District of Tennessee; and plaintiff Sam Steiger is a Member of Congress representing the Third Congressional District of Arizona.

changes which are the subject of this action. Rather it takes the position that it is not proposing any "change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis" and hence is not required to make a submission to the Postal Rate Commission.

The principal issues thus raised by the amended complaint are:

(1) What changes, if any, are being proposed by the Postal Service?

(2) Are any such changes a "change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis" and thus embraced by 36 U.S.C. § 3661?

(3) Do plaintiffs Buchanan, Duncan and Steiger, either individually or on behalf of the putative class, have standing to sue if such Section 3661 has not been satisfied?

The issues raised by the instant request for interlocutory injunctive relief are:

(1) Is there a substantial likelihood that plaintiffs will prevail on the merits?

(2) Is there a substantial threat that plaintiffs will suffer irreparable injury if interlocutory injunctive relief is not granted?

(3) Does the threatened injury to plaintiffs outweigh the threatened harm the injunction may do to defendants?

(4) Will the granting of a preliminary injunction disserve the public interest?

The Postal Reorganization Act of 1970[2] expressly authorized the Postal Service to be sued in its official name (39 U.S.C. § 401) and vests the United States district courts with jurisdiction to hear such a suit (39 U.S.C. § 409). Moreover, 28 U.S.C. § 1339 gives the district courts jurisdiction of any civil action arising under any Act of Congress relating to postal service. Thus, subject to the plaintiffs having the requisite standing to sue and hence presenting the necessary case or controversy for adjudication, this court has jurisdiction of the matters presented by the complaint.

Since members of the public who do not have sufficient nexus with the challenged agency action do not have standing to sue, a threshold inquiry in actions of the kind involved here is to determine the answer to the following two questions:

(1) Have the plaintiffs demonstrated by the amended complaint that the challenged agency action has caused them some injury in fact, economic or otherwise?

(2) Is the interest sought to be protected by the plaintiffs within the scope or zone of interest that the statute (39 U.S.C. § 3661) seeks to protect?

Only if the answer to both of these questions is in the affirmative do the plaintiffs have standing to sue.

Prior to the adoption of the Postal Reorganization Act of 1970, major changes in postal service and changes in postal rates resulted only by Congressional action. This necessarily subjected such changes to careful public scrutiny as the proposed changes traveled their way through both houses of Congress. The right of the public to express its views in a meaningful way prior to the implementation of such changes was not only by public committee hearings but also through the very nature of our representative form of government. Thus the Post Office Department, prior to 1970, was structured to be responsive to the American public.

■■■ In adopting the Postal Reorganization Act of 1970[3] it is clear that Congress intended generally to give the Postal Service broad powers and wide

---

2. Pub.L. 91–375, August 12, 1970, 84 Stat. 719, Codified in 39 U.S.C. § 101 et seq.

3. For a fairly comprehensive legislative history of this Act, see 1970 U.S.Code Cong. and Admin.News, pp. 3649–3723.

discretion in its operations and to remove such operations in large measure from the public and political pressures inherent in the old Post Office Department being replaced.[4] It is equally as clear, however, that on major changes in postal service or changes in rates Congress intended to retain for the public a right to be heard so that the Postal Service would be responsive to the public and the public would have assurance that any major changes in postal service or changes in rates would conform to the basic policies established in the Postal Reorganization Act of 1970. Thus Congress provided as follows:

"§ 3661. Postal services

"(a) The Postal Service shall develop and promote adequate and efficient postal services.

"(b) When the Postal Service determines that there should be a change in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis, it shall submit a proposal, within a reasonable time prior to the effective date of such proposal, to the Postal Rate Commission requesting an advisory opinion on the change.

"(c) The Commission shall not issue its opinion on any proposal until an opportunity for hearing on the record under sections 556 and 557 of title 5 has been accorded to the Postal Service, users of the mail, and an officer of the Commission who shall be required to represent the interests of the general public. The opinion shall be in writing and shall include a certification by each Commissioner agreeing with the opinion that in his judgment the opinion conforms to the policies established under this title."[5]

While a simple reading of such Section 3661 should be sufficient to demonstrate that, with regard to major changes in postal service and rate changes, Congress intended to assure that the Postal Service being created would be responsive to the public, a review of House Report (Post Office and Civil Service Committee) No. 91–1104, May 19, 1970, accompanying H.R. 17070 will dispell all doubt on this vital point. After discussing procedure substantially as subsequently enacted in Section 3661, the House Report concludes:

"The procedures just described represent significant innovations that should materially enhance the responsiveness of the Postal Service to the American public."[6]

 It is impossible to conclude otherwise than that Congress intended by Section 3661 to give to each member of the public a right and opportunity to be heard before "changes in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis" would be implemented. Further proof of this intent is found in the general elimination (39 U.S.C. § 410) of the applicability of the Administrative Procedure Act to the Postal Service but the express provision in Section 3661 that the public's opportunity for a hearing on the record in accordance with the Administrative Procedure Act would remain where changes of the magnitude embraced in Section 3661 were being considered.

In the light of this general background, it is now appropriate to consider the answers to the two questions earlier posed which must be answered in the affirmative if plaintiffs have standing to sue.

---

4. "If the American public is to have the postal service that it expects and deserves, the Post Office must be taken out of politics and politics out of the Post Office." *Id.* at page 3654.

5. 39 U.S.C. § 3661. It appears the provisions dealing with § 3661 subject matter in the House passed version of H.R. 17070 and the Senate passed version of H.R. 17070 differ in form only, both one from another and from the final version resulting from the Conference Committee which ultimately placed § 3661 in its present form.

6. 1970 U.S.Code Cong. and Admin.News, p. 3668.

■ The agency action challenged by this suit is the admitted failure of the Postal Service to submit to the Postal Rate Commission, prior to implementation, alleged changes in the nature of postal services which will generally affect service on a nationwide or substantially nationwide basis. If changes of the magnitude contemplated by 39 U.S. C. § 3661 are being implemented, then plaintiffs Buchanan, Duncan and Steiger, individually and the putative class they seek to represent, namely, all postal users throughout the United States, are being denied a very fundamental right —the opportunity for a hearing on the proposed change.[7] The denial of this statutory right is alone a sufficient injury in fact to support the requisite standing to sue. This injury is compounded, however, by the denial to plaintiffs of the expertise of the bi-partisan, five member Postal Rate Commission which Section 3661 requires must render an advisory opinion[8] on the proposed changes. Moreover, Section 3661 requires *each* member of the Postal Rate Commission individually to certify that he agrees with the advisory opinion and that in his judgment the opinion conforms to the policies established under the Postal Reorganization Act of 1970, thus requiring the advisory opinion to be a *unanimous* opinion of the Postal Rate Commission. In light of the Congressional history surrounding Section 3661, it is clear that this public hearing provision was to make the Postal Service responsive to the people it served. The interest sought to be protected by plaintiffs, i. e., a public hearing before the Postal Rate Commission, is completely within the scope or zone of interest that Section 3661 seeks to protect. The court therefore concludes that plaintiffs Buch-

anan, Duncan and Steiger, individually, have the requisite standing to sue. Moreover, to the extent that the court later determines that this action may be maintained as a class action under Rule 23, the court is of the further opinion that the named plaintiffs, on behalf of the appropriate class, also have the requisite standing to sue.

The court now turns its attention to a determination from the record before it at this time, albeit an incomplete record, of just what changes, if any, are being proposed by the Postal Service. The parties should be aware that the factual findings herein contained are for the purpose of the instant matter under consideration and that the court will not hesitate to alter such findings if later determined to be incorrect after a development of a full record.

While the Postal Reorganization Act of 1970 was enacted August 12, 1970, the Postal Service created thereby did not come into existence until July 1, 1971. During the intervening months, the Post Office Department, under the leadership of Postmaster General Blount, proceeded to develop an organizational structure with which the Postal Service would commence business on July 1, 1971. Among other things, this structure eliminated the then existing 15 Postal Regions, established 5 new Postal Regions in lieu thereof, and established 86 separate Postal Districts throughout the country within the 5 Postal Regions. Thus, when the Postal Service came into existence it inherited, and began business with 5 Postal Regions and 86 Postal Districts.[9]

Postmaster General Blount became the first chief executive officer of the Postal Service and guided it during its early months. Shortly after Postmaster Gen-

---

7. The record demonstrates that Congressman Buchanan and his staff assistants have relentlessly sought to be heard on the proposed changes, if for no other reason than to determine just what changes were being proposed.

8. It is not necessary to decide if the opinion is binding on the Postal Service. What is

necessary is that the advisory opinion be sought and, after a hearing, obtained.

9. It also inherited approximately 600 Section Centers which it has now reduced to less than 300, but this reduction is not involved in this action.

eral Klassen became chief executive officer in January of 1972, he began a review of the existing programs of the Postal Service to determine whether these programs should be continued or discontinued. The review necessarily led to a consideration of new programs also. Either as a result of this comprehensive review or otherwise, decisions were made as hereinafter indicated.

In early 1972 Postmaster General Klassen reaffirmed the earlier decision of Postmaster General Blount [10] to construct and place into operation, at a cost of hundreds of millions of dollars, 21 bulk mail facilities throughout the country and to modify 12 existing post offices throughout the country to serve as auxiliary service facilities for a national bulk mail system. Only one of the 21 new bulk mail facilities has now been completed with the remaining 20 to be completed, and the entire system placed into operation on July 1, 1975. The system is primarily a mail handling system designed to consolidate bulk mail in geographical areas and to move it among the areas on a scheduled (nightly) basis with damage to parcels reduced to an acceptable level, all at a minimum of costs. It is intended to reduce substantially the handling and rehandling of bulk mail and to provide a more consistent or predictable time of delivery, i. e., instead of a delivery time from the West Coast to the East Coast of between four to twenty

days, the system is designed to establish this time at a consistent eight-day period.

During the summer of 1972, Postmaster General Klassen approved a program which authorized the five Regional Postmasters General to reorganize their regions by eliminating or consolidating the Postal Districts in their regions.[11] Apparently the object of this program is to eliminate down to approximately ten, if not entirely, the 86 Postal Districts with which the Postal Service began business on July 1, 1971. This program has thus far been implemented by the elimination of eight, or possibly ten, of these districts. It is apparent that this program has the strong backing of the Senior Assistant Postmaster General for Operations, and it is therefore logical to assume that its implementation throughout the nation will accelerate.[12] A Postal District is a geographical area over which the District Manager and his support personnel (quite limited in number) exercise the combined function of policy makers and decision makers with regard to the operations of the Postal Service in the particular Postal District. This includes deciding (or reviewing) questions regarding decisions relating to the implementation of the retail analysis program (postal facilities' deployment program) hereinafter discussed.

In January of 1973, Postmaster General Klassen authorized the implementa-

---

10. It is not clear whether this decision was made prior to July 1, 1971, but in all likelihood it was in view of news releases issued by the Post Office Department in the spring of 1971.

11. This decentralized authority, as well as the initial authority given to each local Postmaster in connection with the retail analysis program (postal facilities' deployment program), is argued by defendants as clear evidence that the changes here considered are not nationwide. Apparently prior to July 1, 1971, the local Postmaster had to go to Washington for authority to acquire even pencils and paper. As commendable as is the decentralization of authority from the Postmaster General to the four Senior Assistant Postmasters General to the various Assistant Postmasters General to the five

Regional Postmasters General to the 78 (originally 86) Postal District Managers to the thousands of local Postmasters, such decentralization of decision making and authority cannot be a shield to insulate a program available to the entire Postal Service from being nationwide where it is being accepted by the regional or local decision makers throughout the nation either because the program is good or because there is attendant pressure to accept the program.

12. Documents revealing the identities of certain districts scheduled for early elimination have, at the request of defendants, been sealed and will not be a part of the public record of these proceedings at this time. They support, however, this conclusion of an anticipated acceleration on a nationwide basis.

tion of a program which could have substantial effect upon postal users in every area of the country. This program is referred to by high-ranking Postal Service officers as the "postal facilities' deployment" program and as the "retail analysis" program. Indeed, there is some confusion over whether there are two programs or one and whether, if two, the retail analysis program supports the facilities' deployment program or the facilities' deployment program is the end result of the retail analysis program. The program or programs are offered to the local Postmaster who, subject to review by his supervisors, decides whether to accept the program. As of March 11, 1974, the program has been accepted, and is currently underway in 25 major cities located in Alabama, California, Colorado, Florida, Georgia, Illinois, Iowa, Michigan, Missouri, North Carolina, Oklahoma, Tennessee, Texas, Washington and Wisconsin. Moreover, 40 more cities in 1974 are scheduled to commence implementation of the program, with an additional 40 cities scheduled in 1975.[13] Essentially the program includes a retail market survey, both with regard to postal services used or not used by the retail consumer and with regard to customer demand for given services at a particular time or place. Thereafter, a decision is made with regard to all postal facilities in the particular area which decision includes such things as relocating some facilities, closing others and opening new ones; and terminating, limiting, increasing or adding specific services at a retail facility, such as meter postage sales, registered or certified mail services, lock box service, insured mail services, postage sales, package weighing and mailing, postal money orders, and similar services customarily provided by the Postal Service. Post-

master General Klassen states the object of the program to be to develop a coordinated system of facilities, collections and deliveries.

The record developed to date is sufficient for this court to conclude (a) that the Postal Service has determined to implement changes having a nationwide or substantially nationwide character and (b) that the implementation has commenced. While this finding by the court is primarily directed to the Postal District consolidation program and the postal facilities' deployment program (retail analysis program), it is conceivable, though unlikely, that after a full record is developed the national bulk mail system program could likewise be viewed as a change. The record to date, however, reveals that the Postal Service simply decided not to discontinue that program which decision could hardly be viewed as a change.[14]

It is obvious that the changes are viewed by the Postal Service not to involve matters "in the nature of postal services" for it sought no Section 3661 advisory opinion from the Postal Rate Commission. Indeed, since its beginning, according to the Postal Service, it has made no nationwide change in the nature of postal services, for it has never sought such an advisory opinion, an unequivocal statutory prerequisite to such a change. This could either speak well for the services provided by the now defunct Post Office Department or it could be construed unfavorably to the Postal Service. More likely, however, it highlights the central issue involved in this action—just what constitutes a change in the nature of postal services?

 The parties are at opposite poles on this issue and, quite likely, the intended meaning is somewhere between the two extreme views.[15] For the pur-

---

13. See footnote 11.

14. It is interesting to note, however, that counsel for the defendants in argument to the court stated that had the Postal Service decided to abort this program which it inherited from the Post Office Department,

such a determination would *not* have been within the ambit of § 3661.

15. Defendants take the position that only the elimination of Saturday deliveries or the elimination of special delivery service or charging the *recipient* for home delivery

pose of this court's determination of whether to grant interlocutory injunctive relief, it is not necessary to decide that the challenged changes are in fact embraced in Section 3661. It is necessary to conclude, as the court has, that most likely they are and therefore that there is substantial likelihood that plaintiffs will prevail on the merits as to the Postal District consolidation and elimination program and as to the postal facilities' deployment program (retail analysis program) but are not likely to prevail on the merits as to the national bulk mail system program.

Earlier in this Memorandum of Decision the court has concluded that plaintiffs have standing to sue because they are being denied the opportunity for a hearing under Section 3661 on changes being implemented by the Postal Service. The denial of such a hearing, should one be required, is sufficient irreparable injury to support interlocutory injunctive relief, for it is clear that no hearing will be conducted and that the changes will continue unless enjoined. Defendants have made no effort to present evidence as to the threatened harm a preliminary injunction may do to them should the court enjoin the further implementation of the Postal District consolidation and elimination program or the postal facilities' deployment program (retail analysis program).[16] This absence of evidence, together with the irreparable nature of the injury being done plaintiffs, compels this court to conclude that the threatened injury to plaintiffs greatly outweighs any threatened harm the injunction contemplated herein may do to defendants. Moreover, the granting of such a preliminary injunction will serve, rather than disserve, the public interest.

In accordance with the foregoing, the court is of the opinion that it should issue a preliminary injunction which prevents the further consolidation or elimination of Postal Districts and which prevents the further implementation of the so-called postal facilities' deployment program pending further proceedings in this action. The injunction to be issued should not be construed as requiring the Postal Service to reestablish those eight or ten Postal Districts which have already been eliminated, although such affirmative relief may result following a final hearing. Moreover, it is not the court's intention by the injunction to prevent in any way the data gathering aspect of the postal facilities' deployment program or the use of that data in making unrelated, isolated changes which are necessitated by events over which the Postal Service does not exercise reasonable control, such as failure of equipment, fire or other casualty, loss of lease, etc. Such injunction likewise is not intended to prohibit the opening of new facilities or the addition of services not currently being offered at existing facilities. The injunction as to the postal facilities' deployment program should be construed as directed primarily at a general implementation, on a timetable under the control of defendants, of the deployment program in a particular city where such implementation includes closing or relocating a facility or altering the chaarcter, nature or hours of service at an existing facility. Should the parties have any question as to the scope or application of this aspect of the injunction, the matter can be clarified upon application to the court.

An appropriate order of injunction will issue.

---

service or comparable changes can even arguably be changes in the nature of postal services. Plaintiffs take the position that changes which could in any material way affect the collection, transportation or delivery of mail or which could affect services associated therewith are clearly changes in the nature of postal services.

16. Evidence was presented by defendants to support a finding which the court hereby finds, that substantial injury would be done defendants by an injunction of the national bulk mail system program, that such injury outweighs the injury, albeit irreparable, to plaintiffs and that the issuance of such an interlocutory injunction would disserve the public interest.